Appellate, Mr. Kramer for the Appellate, Ms. Bates for the Appellate. Good morning. We're operating under a little unusual circumstance. We're so glad to have Judge Henderson join us. We can see you, Judge Henderson. Can you see us, or you can see counsel, I presume? I can see Mr. Kramer. Okay. Okay. Okay. Okay. Now, Judge Henderson is the senior member of this panel, and by right, she's the presiding officer today, but she's asked me to preside so that she can join from an undisclosed location. So with that in mind, if you'll bear with us, we'll try and get this technology right. We've practiced it a little bit. It seems to work just fine, but we'll need to make certain that Judge Henderson gets the opportunity to ask her questions and to make sure this runs well. But with that, let's begin, Mr. Kramer. Thank you, Your Honors, and may it please the Court, good morning. In a case, because of time limitations, there's several issues in the case, and if I don't get to any, I don't want Your Honors to think that I think they're less important. I think all the issues are equally meritorious in this case. They always are. There are a lot of issues, so I don't know if I agree that you should take your time. Sometimes they're not always, but in this case, I think they are. Let me put it that way. So my main theme or theory is Mr. Williams, for several reasons, because of the actions of the government and the district court, Mr. Williams did not receive a fair trial in this case. And in the appellate stage, I have to say the government makes a number of mischaracterizations and omissions on important issues from the record, the main one being they argue at several points that because of evidentiary issues should not be reversed because of the strength of their case they talk about. Yet in the district court, both the government, when asked by the district court, do you think the evidence was close between murder and manslaughter, and they said absolutely, and they acknowledged that the evidence was very close in this case. And the district court twice expressed that he thought the evidence was very close in this case between murder and manslaughter. That's mentioned nowhere in their brief and is very important, it seems to me, in this court's review of the various issues in the case. The first issue, though, is one that would just simply require outright reversal for sufficiency of the evidence. For whatever reason, the government never presented any evidence that Mr. Williams lived with his wife on July 3rd, the date of the offense that it's required for, on the media, the military. They didn't identify that date with precision, but you couldn't a reasonable juror looking at all the evidence about the relationship between Williams and his wife and where he lived and he'd been seen there, isn't that a reasonable inference for them to draw on? No, for a number of reasons. First of all, they didn't identify really any date when they lived together. Not only did they have to resign with each other, they didn't even prove where Mrs. Williams lived on July 3rd. But in June, a reasonable juror could have concluded that they were living together in June, based on the meeting. And I know you have a response to that, but taking the evidence in light that we have to take, couldn't a reasonable juror think at least in June they were living together? No, not at all. That's the month when the evidence was, not only was there no evidence they lived together, the evidence was the contrary. Well, there's some evidence, right, that he was living around and moving around, right? That's the Sims testimony. We have the Cheris testimony, too. And there is absolutely, the government, when they say there was an inference, there was a meeting in June or early July at Mr. Williams' house, wherever that might have been. First of all, there was evidence of a meeting in June that was not at Mr. Williams' house. Both Sims and Cheris testified that was a meeting where evidence was given into a book to be kept, and the testimony was that was not at Mr. Williams' house. There was no testimony of any other meeting in June anywhere, never mind Mr. Williams' house. The meeting in July was the meeting on the 3rd when these unfortunate events took place. So there's no testimony at all that he lived with her in June or early July. Early July would have had to have been the 1st, 2nd, or 3rd, and it would be very strange indeed. But doesn't Cheris put a meeting at his house at some point in the time frame there? And I realize you're going to then say that doesn't extend to July 3rd, and we can deal with that. But Cheris puts himself at a meeting at their house in March, April, or May. I'm clear. It could have been March 1st. It could have been April 1st. It could have been as late as possibly May 31st. But he says the meeting in June was not at his house. So I guess the simple answer is it could have been. Given every instance most favorable to the government, it could have been a meeting on May 31st. But there's no evidence. You've got to remember, there is no evidence of that. But in June, the evidence was he was not living with his wife. But does that then mean that no rational juror could find that he was residing with his wife? I think that's right. So what's the sense of what does residence mean here? I think we all agreed in the end in the district court that it means living with and that he was living with his wife. What if they were separated? If they're separated temporarily? Well, that's the key word. It's more a legal question now than a factual question. If they're temporarily separated with an unclear intent about the future. I think that's not... That's not residing, you can say. I'm sorry. I think the future has to be taken into account. Because there is the Spencer case where the guy was separated temporarily but then went back to live with his wife or girlfriend. In the Spencer case. In this case, what happened was Mr. Williams left Germany. His mother testified, came to live with her and stayed with her. No mention of Octavia at all, his wife at all. So you could... I think a separation could be permanent or temporary. In this case, all the evidence is that it was permanent. Because the testimony from Sims was that in June he was living elsewhere. But if it was temporary, what's the law in your view on whether you're still residing? Say you move out for a few weeks from your spouse because you're having problems. Are you still... Is your mail still coming there, though? Do you still have some possessions there? I think the law is that you're not residing there when you move out. Whether it's for a week or... I think it's different. You're talking about a separation. It would be different for a vacation. But for a separation, I think you're not living with her anymore. Whether it's temporary or permanent. I admit that it may be a tougher case if it's temporary, but we don't have that in this case. It's permanent. Is that what the statute's trying to get at? Trying to exclude from its jurisdiction people who are temporarily separated? Yeah. Well, the statute says residing with. The legislative history emphasizes must. They use the word must reside with to come within the statutory scheme. So for whatever reason, and I'm not clear. It's not clear why. For whatever reason, Congress was actually emphatic that the person must reside with the armed services member to come within the statutory. Yes, I'm sorry. Let me ask you, is there anything in the legislative history or anything in the evidence that whenever he was residing, he was on the base, it seems to me that the requirement that a citizen reside with an active member of the military, meaning on the base as opposed to somewhere else in a foreign country. There is no – it says reside with and has to be independent. There is – actually, the house that's in the evidence was not on the base. There is nothing in the evidence to show that he ever lived on the base, I think, actually, with or without his wife. All right. So we don't know that a citizen's residence was on the base? The house that was identified by the witnesses was not on the base. It was in a town a little ways away from the base. When Sims said that Mr. Williams was moving around, living with other people, he didn't say who they were, but there's certainly no evidence that they were on the base either, and there's actually no evidence that they were active-duty military at the time. But he clearly wasn't a dependent of those people in any event. So the case was tried by the government on the theory that he lived with Octavians, and the government didn't even present any evidence that Octavians still lived in Germany on July 3rd, the crucial date. They presented no testimony of where Octavia lived on that date. So it's not just it has to be residing with. They have to be living together. So they just presented absolutely no evidence of that, and there's nothing that would allow an inference either. There was no meeting, no testimony that there was a meeting at their house in June. In fact, the testimony about 1 April or May is when he, although he had said in earlier testimony that he admitted he had said he had been initiated in March. So I have to concede that it could have been as late as May, yes. But he was quite, they were both, he and Sims were very specific that the June meeting that they referred to with the book was not at Mr. Williams' house. So that's as close as the government can get, and the Sixth Amendment requires proof beyond a reasonable doubt. I mean, the Supreme Court's been pretty emphatic about that in the past few years. Could you address the issue of consent or assent? Absolutely. Is that what you were going to say? The issue of consent, that was the whole, the difference between murder and voluntary manslaughter, which we know the government and the district court conceded was very close. The whole difference is the state of mind, the recklessness. And that's a subjective, one of the main components of recklessness is a subjective component. And our whole defense was based on the fact that when- Is that right? Is it always subjective? Can't there be instances where the nature of the conduct is just inherently extremely reckless? To find that the government must prove beyond a reasonable doubt that the defendant acted- So I think the answer is yes. There's always a subjective component. Well, no, but aren't there going to be some circumstances in which the nature of the conduct in which the defendant participates is inherently reckless, inherently excessively reckless? But the government still has to prove that the defendant knew that. And the jury instruction said that in this case, and the government hasn't disputed that. And I think the case law is pretty unanimous on that, that the government has to prove that there's a subjective component. It is an objective, a little bit of an objective component, but the instructions were the fact that a reasonable person would have been aware of the risk would not sustain a finding of malice. So, in fact, the jury's instructed that they have to find the defendant had this reckless state of mind, had this subjective state of mind. So I think the answer- And as I understand your argument, you're relying upon the fact that when Williams was involved in this attack, initiation, hazing, whatever, the fact that Johnson did not show signs that he was going to die, that that ought to factor into our analysis of the state of mind of Williams as he's participating with eight other people in beating him up. It's a little bit more than that. Well, I guess it's a lot more than that. First of all, there had been as many as 15 prior initiations, and nobody had ever even needed medical attention, never mind been seriously injured. The testimony was that Sergeant Johnson had no bruising, no blood, other than a little bit of a cut lip, no black eye, no any outward signs. But the main thing is he was repeatedly asked, both Sims and Sarah who testified, he was repeatedly asked, are you okay, do you want this to continue? And they both testified if he had ever said no, it would have stopped. That's what I'm getting, you're relying on Williams' assessment of his state, right? That Williams is saying, I'm not dying, I'm not dying, go ahead. And that that ought to factor into the state of mind that, I'm sorry, I said it wrong, that Johnson said I'm not going to die, and that that ought to factor into the state of mind of Williams. I think there's no better evidence, I think, of whether what a person perceives is the risk than the person who's been Sergeant Johnson's repeated affirmation. There are some areas where we don't care what the victim says, right? I mean, the whole law of consent, the controversy with the instructions, there's some type of activity that we never look to the victim's state of mind to determine the culpability of the perpetrators, isn't that right? Yes, and I'm not talking about Sergeant Johnson's state of mind. I'm talking about what Mr. Williams observed when Sergeant Johnson was asked, are you okay? When I say Sergeant Johnson's state of mind, Sergeant Johnson's making an assessment that, as I understand it, the way you see it is Sergeant Johnson is saying, in effect, I'm not going to die, you're not engaged in an activity that is going to kill me. So, therefore, Williams doesn't have the state of mind where he should have known that the person was going to die. I don't mean to misstate your argument. I mean, it's a little bit more nuanced than that, but that's basically it. But aren't there some types of activities, some types of conduct that we just really don't care about the assessment that's being made by the victim? We agreed when we proposed the instruction, we proposed the instruction that they could consider his actions as consent with respect to the murder charge because of the extreme recklessness that's required for murder. We didn't say it was anything to do with manslaughter, and I think the answer to your question is no, although I don't remember whether it's yes or no at this point. But the answer is, in determining the degree of recklessness, what the victim does, we weren't claiming he couldn't be convicted of manslaughter because of this, but we claimed that the difference between the extreme indifference and wantonness of first-degree murder, when you see the person who's participating repeatedly saying, yes, I'm okay, I want this to continue, and actually he was described at various times as hyperbolic. I'm trying to get at it. Maybe I'm not doing it well. I mean, it seems to me that when you look at the way the district court treated this, they put this case in the consent box, and we all know you can't consent to be part of that. And I'm trying to understand why the district court did that, and it seems to me there's a strong argument why they did that, because this case looks an awful lot like those consent cases. And in those cases, we don't care the state of mind of the victim. We don't care that they assented to it, because there's a certain type of behavior that crosses a line, and when you cross that line, we don't look at the victim and what they're saying. And so what I'm getting at is why don't you think this case is in that box? Why can't we say this is the type of activity that is so inherently dangerous that it shows such utter disregard for the life of another? You've got eight people, not just one person. This isn't a ballroom brawl between two people. This is eight people ganging up on someone. Why can't the district court say, why can't we say, in that type of scenario, we don't really care what the victim is saying and the victim showing that, oh, I'm not going to die from this. It seems to me you put a lot of emphasis on that, and I'm just wondering how you can get out from under the doctrine of consent, which seems to me to be speaking to a situation where there's just an inherently dangerous activity going on that we don't look to the state of mind of the victim. Before you answer that, Mr. Kramer, this consent that you talk about is the consent to me that someone who is either drunk or hunched drunk would give. I don't see why we should give any credibility to it. He's been hit over and over again. The first step knocked him to the ground. I don't know whether he keeps saying, continue it, when he's actually under there, when they're hitting him. But to me, it was senseless from the first step. And what do you do with consent when consent is given by someone on drugs, drunk, or hunched drunk? I'll answer both questions, I guess. Maybe yours first, Judge Henderson. There was no evidence of that. In fact, he was described as very hyper at the beginning, and he was described as very hyper throughout, although it lessened somewhat and excited. There was absolutely no testimony that he was ever impaired in any way. In fact, just the opposite. He looked just like everybody else through this whole thing. And he never wheezed, was short of breath. And at the end, he looked just like everybody else. So it's not like somebody under the ‑‑ there was absolutely no testimony that any of his expressions, please, yes, I want this to continue, and the excitement, and he used different words that I won't use. But the excitement that it was any way the effect, that the initiation had any effect on that at all. There's absolutely no testimony about that. To answer your question, Judge Griffith, there is a distinction between the state of mind for murder and manslaughter. That's always been a distinction, the extreme and wanton disregard that's required for a murder conviction. And to do that, you have to assess the defendant's state of mind. To do that, you have to look at what he viewed was going on. And every time Sergeant Johnson was asked, he said yes or hell yes or another word. And it's not excluded. We didn't try to exclude it from the manslaughter. We understood that. But the cases the government cites, there's one case called Dura where there was an initiation. It's actually a manslaughter conviction. And the court said you can't consent to a battery. Yes, you can't consent to the activity, but the state of mind that distinguishes murder and manslaughter, it's not the consent itself. It's Johnson's actions and repeatedly saying yes, I'm okay. And that's why I think the word consent has gotten everything on the wrong track, perhaps, in the district court. Because it's really the statements that the victim made about his condition, right, would show the defendant, in your view, that further punching was not going to kill him, or further kicking was not going to kill him or cause him extreme bodily injury. So I think consent is the wrong term. I think you're absolutely right. It was used as a shorthand term, but the district court clearly understood it. In pages 368 and 370 of the appendix, the district court said, I suppose, in fairness, it goes beyond the word yes. Mr. Johnson was asked, are you all right? Do you want to keep going? He responded hell yes a number of times, not just once. The question is whether those responses or statements constitute acquiescence and whether acquiescence can ever be considered. And then he said, about our argument, Judge Friedman said, what he said is not the issue of consent. It's the difference between the nature of the reckless disregard for second-degree murder and the reckless disregard for manslaughter. Because when he's saying, keep going or, you know, I'm paraphrasing now, if he had been saying, stop, stop, I can't breathe, clearly the government would have presented that as a give it a in the recklessness, wanton recklessness for murder. Right. So the fact that he's saying, I'm fine, and, again, I'm paraphrasing, perhaps overstating, would be also, it would seem, relevant. But then the question becomes, are the instructions really flawed, or are you complaining about the way the colloquy proceeded in the closings, and, you know, you say what you say, and then the government comes back and says, you're wrong on the law, and then that never gets, I guess, cleaned up is your view, right? I guess all of the above. The government can't, I said, let me, I'm sorry. It's a bad way to phrase it. If you just had the instructions without what happened in the closing between you and the government counsel, did you have any problem with the instructions standing alone? Yes. We wanted to add this thing. You may consider consent in determining whether the defendant had the necessary malice of forethought to establish the crime of second-degree murder. In other words, we made it clear that it went, we tried to make it clear that it only went to the distinction between second-degree murder and manslaughter. That was foreclosed. The district court refused to give it. The government told the jury the district court's instruction precluded that argument, and that they could not consider the consent, meaning the short, in any, for any purpose having to do with Mr. Williams. I guess my concern, this will be a question for the government, is, is it possible that the jury went back there and someone in the jury room says, well, he kept saying it was okay, so I think it should be manslaughter and not murder, and another juror says, well, we can't consider that. That's exactly the argument we made to Judge Friedman and that the government objected to and was rejected. We made that very argument that said, this is our defense. We're worried that a juror will go back there and say that they could, we can't consider this for any purpose because the government just told them they can't consider it for any purpose. You denied our instruction that they could consider it, and therefore, not only did, so they were precluded from considering it according to the government and according to the instruction. So that's exactly the argument we made that was rejected. And I don't see how, it seems to me the most crucial piece of evidence in assessing Mr. Williams' recklessness, state of mind, is what the, if Sergeant Johnson was bleeding everywhere, had a broken arm sticking out of his, the government would have put that on as clear evidence that Mr. Williams knew he was in great danger and was very reckless in continuing. If he had said, no, I can't take it anymore, I can't breathe, I'm about to die, I'm going to fall down, the government would have presented that as exhibit A. The converse has to be true. If that's relevant to Mr. Williams' recklessness for first-degree murder, it has to be relevant that Sergeant Johnson kept saying, I'm fine, hell yeah, continue, I want this to go on, and not just once, but a number of times. And Judge Friedman recognized the very argument we were trying to make and said, no, you can't make that argument. How do we factor in what happened afterwards and not going, saying not to go to the hospital? I know there's some testimony that originally was a phone call. Well, right after the initiation, he said, take him to the hospital. But he still made a phone call, right? That's hours later, and I don't think you can factor that in at all, frankly. The state of mind has to be when the acts were committed. And I think it may be – What's your story to that? Well, I – We can't – let me just say, we can't consider the depravity in instructing his subordinate, no one else taking him to the hospital. I think it's a Supreme Court case that talks about that the recklessness is at the time of defense. But I will try to find it in – well, I'm for rebuttal if I have any time left. I apologize. But it's clear that the recklessness is – I mean, you can – there's a couple of cases in government sites where they beat up a person, threw them in a ditch, and left. And then they said leaving and failing to get him medical care. But that's right at the time of the events. There's no case that talks about hours later. And, again, Cherish could have taken him to the hospital. It's just Mr. Williams at that point is scared. But I don't think it has anything to do with his state of mind at the time. And, as a matter of fact, at the time, Sheridan and Sims both said Sergeant Johnson looked the same as everybody else did after these initiations, and no difference. He was winded. I mean, he was a little tired, but he wasn't wheezing or gasping for breath or out of breath. Sheridan, who had medical training, said, I never would have left if I thought he was in any danger, and said that he looked fine. Even Cherish, who was his friend, said when he first saw him on the ground, he looked fine, he was joking. It wasn't until later. So I don't think that you can ‑‑ that that goes to his state of mind at the time of the events, what happened, I guess, three or four hours later, depending on the time frame. Can you talk a bit about the pregnancy issue? In most of the cases, the victim was pregnant. I think it's about half. But the courts equate that. There's two major cases where the family, where it talks about the Illinois case. Yeah, the Illinois case is a good one for you. And the courts don't seem to distinguish between the two. They find the two equally irrelevant and equally extremely prejudicial. Judge Friedman admitted in the post-trial proceedings that he had made a mistake, that this evidence was irrelevant. The government doesn't even acknowledge that in their brief. They continue to argue it was relevant under a theory that Judge Friedman said they had abandoned in the district court, this theory that it meant Sergeant Johnson was not in it to be killed, which is totally irrelevant, what his reasons for wanting to have the initiation or his state of mind as to why he wanted to have the initiation or how he went into it. So Judge Friedman admitted afterwards it was irrelevant. So the government doesn't even address the prejudice issue in their brief. They pretend as if Judge Friedman had said it was relevant. The only thing they do say about prejudice is the strength of their case, which I just had talked about, I know, that in the district court they admitted it was an extremely close case. The case law is that this evidence, even when not objected to, warrants reversal. There's three cases, I think, that reverse it even when there was no objection to it because it's so prejudicial. And they brought up the – and, by the way, Judge Friedman said we had objected to it. We didn't need to object anymore. We had done exactly what we needed to do. The government doesn't acknowledge that in their brief either. But this evidence is of no relevance at all, utterly irrelevant, and extremely prejudicial. There was difference of opinion, but even Judge Friedman said he heard the whimpering when Mrs. Johnson walked out of the courtroom. She was asked how she told them that she got pregnant, which was irrelevant, on their anniversary. He came home to help out while she was pregnant on the first doctor visit, and then they brought out the date of birth and the name. They had even told Judge Friedman they wanted to put in two pictures to show that the baby looked like Sergeant Johnson when he was a baby. I mean, I think that tells you why they were trying to put it in because it was so prejudicial. Now, those two pictures didn't come in, but this testimony, I cannot – you cannot overstate how prejudicial this testimony was. Every court we've cited has recognized it, and the government doesn't cite one case because they ignore the cases that talk about that. So they don't have any counter case that says that it's okay. The two cases that don't reverse on it, one was because the testimony came from the medical examiner, and the government never referred to it in their opening or closing. And then there's another case where there was overwhelming evidence of a drunk driving with multiple eyewitnesses. This case, again, a close case, and the testimony was extensive, very dramatic, can't be overstated. And the other thing was the government started its closing argument by saying he went home to his pregnant wife. I mean, that's the way they started the closing argument. That was the first thing they said in closing. So the prejudicial value of this was extreme, to say the least. And the – as I said, the government in their brief doesn't address any of the cases or even acknowledge that Judge Friedman said I made a mistake here. It was irrelevant testimony. I guess I'll leave it at that. Do you have any more questions here? Judge Henderson, do you have any more questions for Mr. Kramer? No. Okay, thank you. Thank you very much. We'll give you some time back on that. Thank you so much. Ms. Bates? Good morning. Good morning. May it please the Court, Warren Bates on behalf of Appellee of the United States. I'd like to address the three issues that Appellant has addressed, and I'll start with the deficiency question on the residing with. Here, the evidence that the government presented was sufficient for a rational juror to conclude that Appellant lived with his wife and resided with her at the time, the relevant time, the time of the offense. Do you agree, though, that the latest date that we can definitely get them together is May? No. What's the later date and what's the basis for it? So I would point to two separate pieces. First is that there was unqualified testimony from three separate witnesses identifying the house, that that was their house, and that Appellant's wife, Octavia, lived at that house. But there was never a timeframe associated with that, right? I mean, at the very least, this is pretty poor evidence of a jurisdictional element here, right? I agree that there could have been additional evidence. This isn't hard to do. This isn't hard to do. This isn't hard to put on evidence of residence. Unless they didn't live together. Yeah, exactly. I agree that there could have been additional evidence, and it's the way that this played out at this trial. I mean, I think that at the time the MJLA was made, I'm sure that a prosecutor in that position would wish that they could turn the clock back and ask an additional question. But the question that this Court has to address is whether, given the evidence that there was, was it sufficient? And it's a sufficiency review. All of the inferences drawn in the light most favorable to the government. And where there are three witnesses who testify, there is a timeframe. There's a 2004 to 2005 timeframe that's generally put over the that's their house. That's where Appellant was living and his wife was living. And then you add on top of that a narrowing down the timeframe using Charest's testimony. And that gets us to? June, at least, and possibly into July. Mr. Kramer says it only gets you to May because the meeting in June was not there. Well, and I think that's a flaw in Appellant's argument. He's assuming that there is one meeting in June when, again, drawing the inferences in the light most favorable to the government, there is direct testimony from them that they met at least twice a month. There is no testimony that June was different somehow. You have Charest who testified that he joined the Gangster Disciple Organization, the group, in April or May, and that he attended a meeting at Appellant's house. I mean, he's clear. I attended a meeting. Sim says Williams is living elsewhere, moving around, and that's what creates a bit of a problem here for you. So I think looking at the words that Sim testified to, he says that they're having marital problems. I think we were talking about, you know, are they separated and what would the effect of a separation be? I think it's somewhat telling that no one is suggesting that they are separated or divorced. They're having some problems, marital problems. They're staying with people and he was all over the place. I think from that statement you can draw from that that he has not moved out. He doesn't have a new residence. You know, he's getting in some whatever it may be. He's fighting with his wife and, you know, on this night he's staying, doesn't want to stay there, and is staying somewhere else. Do we know that Octavia still lived in Germany as of July 3rd? What we know is, again, the testimony was unqualified, that that's their house where Appellant lived with Octavia, not that it became Appellant's house. We know that at the time Appellant had separated from the military, which is in May of 2005, that Octavia gets dependent status for her husband, for Appellant, which places her still to be a dependent of someone, they must still be located there and serving in the military. And then we have added on top of that, the charge specifies at that meeting, again, as Judge Friedman, you know, parsed through that evidence, with the inferences that meeting in June or very beginning of July, charge testifies that not only was it at Appellant's house, but that Octavia was actually present at that meeting. Appellant has tried to point to kind of the evidence of what happens after Sergeant Johnson has died to suggest that that is an indication that Appellant has no intention to, you know, continue residing with their remains. That's a, that moment, that's a game changer. The fact that he at that point goes to one of the other members of the organization and says, I need the dues because I've got to get out of here because they're going to come out after me and leave the country, I mean, I don't think that that has any bearing or relevance on the question of, before he found out that Appellant, before he found out that Sergeant Johnson had died as a result of this initiation and jump in, that he was planning, in fact, it shows he wasn't planning before that to leave Germany. And that's an inference that, again, the jury could have drawn. So I would say no one has suggested that reside with requires that the person be on every night, you know, surrounding the critical time frame, be physically present in the house. It must be that you have a place where you regularly live or have a home and establish the vote. And that is what the evidence and the inferences from the evidence established. I'd like to turn, address the second issue, the consent issue. I think in looking at the consent question, it's important to step back and understand how this all played out over the course of the trial. Everyone was very clear before the trial began that consent was not a defense. And consent is a term that has a particular meaning. And what Appellant then attempted to do was to make the argument that he's now referring to, I wanted to have the jury consider the facts, the circumstances, you know, how Sergeant Johnson looked at the time of the jump in. But he tried to make that argument by calling it consent. And that's where I think there's an issue here and what the government picked up on in rebuttal and said, the judge is going to tell you, consent is not a defense. So understanding that, it's also, I think, important if you look at Appellant's closing, he was not foreclosed from making these factual arguments that he's now advancing. But then the government comes in and says that that's all wrong, I think. And that's where it's left. And so what concerns me is what I said to Mr. Kramer. Is it possible that when we go back in the jury room, the juror says, well, I think it should be manslaughter, not second degree, because Johnson kept saying, I'm paraphrasing now, I'm okay. And another juror says, well, we can't consider that. That's what it seems to me that there's a possibility of that, and that concerns me. So how do you respond to that? So I would respond that both parties here were asking the jury to consider these objective facts and circumstances about kind of what unfolded at this jump in. And that the objection, or objection B, comment that the government made in rebuttal was very closely tied to the use of the word consent. It's unquestioned that in closing, Appellant argued, you know, the judge is going to tell you consent is not a defense, but you can consider that in assessing state of mind. And that's what the government picked up on and argued, no, no, no, you can't consider consent. But both parties then went on, and Appellant went on separate from that passage that kind of spurred the comments from the government in rebuttal, to at multiple times during closing, argue to the jury. Consider the fact that his appearance during the jump in. Consider that Sarah Glue said that he didn't think that he needed any treatment. Consider that he was telling, you know, essentially telling the members of the group at that time that he was okay. And Appellant had the opportunity to make that argument. The government's rebuttal comments were very focused on consent. And then you look at the judge's instruction. The government says, Mr. Kramer gave you some incorrect law. Consent is never a defense to murder. But then it goes on, under no circumstances is consent a defense to the crime of homicide. So remember that. You can't even consider it in his intent or anything else. You just cannot. Is that correct? I don't know this closing. I don't know that we're always our most eloquent at that time. But the idea, you cannot consider consent. This is the key point on which I think a juror could say, well, that's going to sway me one way or another between manslaughter and murder is this exact point, which is the defendant's appreciation of how hurt Jonathan already was. And I'm not sure what the juror would think based on how this transpired. So I have two responses. First, the comment, again, you can't consider consent. If consent was a defense as to the then trade-off. That's the wrong word, right? That's the wrong word. Right. But that doesn't mean, I think what happens potentially, this is what I'm thinking about, is that Mr. Kramer in the closing was talking about the appreciation of the condition of the victim. And then that got lumped into the word consent. And Judge Friedman recognized this, that in the argument, in the questions, when he had already been outside the presence of the jury. But then when the prosecutor comes back in closing and really lumps it all together and says you can't consider any of that in intent or anything else, the juror would probably walk away from that thinking, well, if the prosecutor is right about that, I can't consider it at all. Well, so I think stepping away for a moment, but I want to come back to the arguments that Appellant was able to make in closing. The court did not endorse the prosecutor's statements in rebuttal, but in fact suggested to the jury that after the arguments and after what they heard as this debate over what the judge was going to instruct the jury, since the jury had not yet been instructed, the judge was very clear with the jury that we've made some minor changes after these arguments and I'm going to tell you the law and you are to follow the law as I instruct you. And the court's instructions were that consent was not a defense. The court, I think, both in the instructions that were given, separately instructed the jury that they could consider all of the evidence direct and circumstantial and that the attorney's arguments are not evidence and that it's the judge's instructions that are the instructions the jury should follow. And I think it's important to factor into the consideration here, Judge Friedman also offered to Appellant in the discussion that was happening after the closing arguments, offered, saying, look, the curative instruction that you're proposing, I'm not going to give it because it has the same problem. It uses the word consent. I think what you're trying to get at is, you know, the facts that go to Mentreya. Would you like the state of mind instruction? And Appellant says no. And so I think even without that instruction, which Appellant declined, the instructions here in limiting Judge Friedman, you know, may lie. And how would that instruction have helped the jury? To the extent that there was, and I think it could have helped. I think it helped flesh out this difference. I understand that you think the jury didn't need any help, everything was fine. What would the state of mind instruction have done? It's helping to inform the jury about the fact that they consider, can't consider all of the facts and circumstances in assessing Appellant's state of mind. And those facts and circumstances, as Appellant argued to the jury, and I'm looking at pages 42 and 43 of his closing, which is separate from the kind of consent piece. He argued, no one said he needed medical attention. He said he wasn't confused. Verily was not concerned. It's specifically said because Sergeant Johnson kept responding and saying he was okay. He had no idea that anything like this would happen. He was elated that he made it through. Those types of facts and circumstances, and the government may disagree, but that's really what the evidence showed here, and I think that's another piece that's relevant to the court's consideration of the consent issue. But Appellant had the opportunity, and by the judge instructing the jury that consent was not a defense, yet telling the jury that they were free to consider all of the evidence, not, you know, striking evidence or arguments of improper, not endorsing the government's rebuttal, that that would allow the jury to have understood that to the extent Appellant was asking them to look at kind of how everything played out, not whether Johnson subjectively consented to this, but how the circumstances played out, that that was before the jury and that they could have considered it. You agree it's relevant if he's saying, I'm fine, the victim. He's saying, I'm fine, I'm okay. That's relevant to the juror's evaluation of manslaughter versus second degree. I agree that that, I mean, I think this is all depending on the facts and circumstances, but that that could be a fact that is relevant, you know, depending on the other facts and circumstances in assessing Appellant's state of mind. Because if he was saying, stop, I can't breathe, I can't breathe, you would surely say that that's relevant. I agree. So the opposite has to be the same, too. If he's saying, I'm fine, keep going, that's part of this process that they've done many times before. Let's step back and look at this distinction between second degree murder and manslaughter and how it was presented to the jury based on the evidence and based on the argument. The distinction between the two, the government, the difference the government made to the jury was look at after those statements, so if I'm, you know, hell yeah, kind of I'm fine type statement. After that, what happens? During this six-minute jump in, he's falling back into the other members of the group, being held up while his punches continue. More punches to the face. He's fallen to the ground. He's unable to get up. The face doesn't show much injury, though, right? There are no broken bones, right? That's true. There's blood, you know. I say that not to minimize what happened. I say that only to the evaluation of the defendants' appreciation of the risk. He's fallen to the ground. The testimony was that at, you know, what the rules of this organization were, was that at a jump in, if someone can't get back up, it's done. That's not what happened here. He's on the ground. There's testimony he's curled in the fetal position while appellants and others following suit kick him and stomp on him. At this point, there's no suggestion that he's indicating I'm fine or keep going, I'm ready to go, but there's testimony that his face, when someone with the flashlight beats his face, he looks terrified. He looks scared. And that's the kind of piece that the government latches on to and asks the jury, consider those facts in its closing argument. That's malice. And so nothing about kind of this consent issue and whether the jury could have, which, again, I don't think that they could have been confused, and they certainly didn't indicate through any questions that they were confused by this. I think it's somewhat of a red herring to say that that's the core key piece of the issue. The government, I think, accepted that, elicited that evidence, but latched on to what happened after that, what happened after Sergeant Johnson stopped saying anything indicating that he was okay to continue on. How far into the six minutes did he stop saying he's okay? I don't have a precise answer to give that, but I think that that's true. How far into the six minutes did Sergeant Johnson stop saying, in effect, continue? Isn't that critical, that question? No, I think the evidence shows that it was not, certainly not once he had fallen back into the group and was on the ground. And piecing that together, I think that the evidence was that he said he was ready at the beginning. After the first punch, he got back up and reaffirmed that. That he then was knocked down, I believe, again. And then the next piece of the jump in that's testified to is kind of the mass melee, when he's fallen back and being held up into the group. And at that point, which I don't know precisely how many seconds, but I think the inference and evidence there is that it wasn't very far in, at that point there's no more testimony or suggestion that he's saying or being asked, are you ready to keep going? And certainly not once he is on the ground. Is the autopsy report in evidence? I believe, no, it is not in evidence. There was testimony, but the report itself was not. I think there were certain photographs were introduced, but not the report itself. So unless there are further questions, I'd like to address the third issue, which is the testimony about the pregnancy. The government has made in its brief and made before the trial court its argument as to relevance, and we stand by that. But I think this court does not need to address that issue, because you can resolve this issue on the fact that the evidence that was admitted here was harmless. And that is because... Has any other court said that? In a case where there's pregnancy evidence like this? Yes. I think the two cases that Judge Friedman cited, I think, I believe are Lewis and Oronoa Randall, both find no prejudice given the facts and circumstances of those cases. Different circumstances there, but it's got to be somewhat prejudicial. It's the lead-off, and the prosecutor knows it, because it's the lead-off to the closing statement. So it's the lead-off to the closing statement, because the closing starts with a story, which was kind of one of the issues that Appellant had created in this case, of how did we get here? How did we get to this jumping? And the story is not to incite the jury with any suggestion that they should be thinking about a child left behind, but the story is simply to understand why does Sergeant Johnson want to join the gangster disciples? Why did he start this process? And it's because he was about to separate from the military. He was planning for how he was going to start this business at home, where his family was going to be. And I think it is the first reference, but it is not highlighted in any sense in the manner in which this testimony could become prejudicial. It's simply part of that background piece of the story. What's your response to the whimpering? First, there's no suggestion in the record that there was any emotion at the time that these particular questions were asked. They were asked on direct. She then goes through cross and redirect, and there's no further mention of the pregnancy testimony. At the time that Kenneka Johnson is leaving the courtroom, I think it's understandable and perhaps to be expected that this was highly emotional both for her to testify, the trial related to her husband's death, and that there are other families there. I'm not sure that the whimpering, it's not connected to this piece of pregnancy testimony. It's separated in time from that, and the record just goes. Judge Friedman said that he thought this was a close case, the distinction between murder and manslaughter. In what sense was he speaking? I think the context in which that statement and the statement by the trial prosecutor were made were in discussing the legal distinction, the degree of recklessness in a sufficiency argument about what needs to be shown for secondary murder as opposed to involuntary manslaughter. I think it's a possible understanding that those comments are motivated by the idea that it is a fine distinction. It's a distinction of degree, of is it reckless or extreme recklessness. Even if you take the comments to be somewhat of a comment on the strength of the evidence as a whole, I think you also can look to the fact that Judge Friedman, who understands harmless disanalysis himself, even after he goes through the analysis of questioning what's the relevance of the pregnancy testimony, he himself, having sat through this entire trial and understanding his view of the evidence, would find that this was harmless given the context of this case. To the extent that you are looking, and again, the prosecutor's view, the district court judge's view, we're not finding on this court's view of the evidence that it's what matters, but to the extent you are looking, he himself thought that this pregnancy testimony in context of what he said, it would have been harmless. Is it your argument that this type of activity was inherently excessively reckless? That when eight people are going to beat up on someone, that we're dealing with a type of activity in which we can infer that the requisite malice is there? Yeah. It's just such a dangerous activity? I think the jury absolutely could have found that, and that it would be based on the activity. And that's what the government was asking, essentially, the jury to do. And the case law is clear that even though the government must also prove that the defendant was for second degree murder, aware of that risk, that awareness can be proven by the nature of the acts themselves here. And I think what the government, the nature of that activity, it wasn't even just the group. It was at the point that he is held up by others and on the ground. That is the key piece that pushed this over the ledge. They've done it 15, I'm not defending it, but they've done it 15 times before, and there's been no medical issues with that. And presumably they're doing the same kind of thing here. Well, the evidence showed exactly the contrary, which was there were descriptions from sins. There was some kicking here that didn't occur in the others, I understand. I mean, they described this as unusual. Did this last longer, or this just lasted longer than the wait of the day in Chicago? So I think that the evidence showed that the Ramstein set of the gangster disciples had a standard six-minute jump in. This lasted slightly longer. There was testimony about once the timekeeper was calling time, it was still going, and time had to be called multiple times. But there was very clear testimony. Weren't there twice as many people participating in this? There were, I think, possibly twice as many, if not more, based on the various pieces of four to six and nine here. There was testimony that there was no kicking before, that there was in prior jump-ins that you weren't allowed to be held up, that once you hit the ground and couldn't get back up, that ended the jump-in. All of those things led to witnesses' characterizations that this was unusual, that this wasn't the norm. So to the extent that you're looking at what was the standard jump-in, the standard one, the evidence was that Appellant knew that that was dangerous because he thought it might kill the female member of the group, but that this was so much more than just the standard jump-in. Would you speak to the issues surrounding the use of the expert? Why was there an expert needed here? What was the point of the expert? I think that part of the evidence that came in in the theory in this case was that you have this organization, and you have Appellant who is the head of this, and there's some significance of that. Did you need an expert to show that Williams was the head of this group? Didn't the fact witnesses do that just fine? I think that perhaps we could have reached the same outcome, but that's not the standard here. The expert was relevant to put that in context to explain the significance when members were refusing to cover up their tattoos, and Appellant was sending messages threatening them if they didn't cover their tattoos, why those tattoos were relevant, why it is in this organization not appropriate to cover your tattoos. The reasons that Appellant... Did the expert ever make any connection between the Gangster Disciples International and the one in Ramstein? I think the expert was asked questions about the specific tattoos on the Ramstein members, the jewelry, the pictures, the stances and clothing, colors that they wore, and said that those were all consistent with the broader Gangster Disciple. But you have here an evidence, separate from the expert also, of connection, which is that you have specific evidence that Leticia Ellis, for her jump in, learned about, and then Appellant wanted the other members of the group to learn about this broader Gangster Disciples group. So I think that that was connected here, both with the physical evidence of the tattoos, the jewelry, the stances, the jump in procedure, use of the term governor for Appellant, the head of the organization, the universal handshake. All of that was here, and all of that factored in to the relevance of the expert's testimony here. But that was just to establish that Williams was the leader? To put in context the testimony about the structure, the authority that Williams had to make it understandable and aid the jury in crediting testimony that Williams would have been the one to, first he denied that he was there. That was one of the defenses, that a jump in was led by the governor, that his presence would be likely and that that defense was unlikely. And that he was the one who would have been directly involved in setting the tone for this. And I think that the expert was relevant to all of that, as well as understanding the witness's testimony and allowing the jury to understand and make those credibility determinations based on their testimony about kind of the interactions between Appellant and the subsequent tampering charges in this case. Okay. Unless there are any further questions. Any further questions Judge Henderson? No. Okay. Thank you. We ask for the judgment of the district court. Thank you, Ms. Bates. Mr. Cranberry will give you back three minutes. Thank you. I'll try to just touch on the points. With respect to the major and whether he lived with, and the government says at the time of the motion for judgment with Quill, you've got to remember they incorrectly state in their brief that the court just reviews it as at that time. We renewed our motions and the defendant's mother, Mr. Williams' mother and his commanding officer testified, and they never asked either one of them, did Mr. Williams still live with Octavia, either. So they had ample opportunity, if Mr. Williams in fact lived with Octavia, to ask more witnesses about that, and this court's law is clear that the court can consider the evidence that came up after the motion for judgment of Quill if it's renewed. How about the fact that there was an evidence he moved to another place, as Ms. Bates says? It seems to actually say he moved two or three times. He moved around, but not to, it wasn't, and I realize the burdens on the government, I get that, but just you would have thought if he had moved out there would be a place to which he had moved. It seems to actually say, Rico moved a couple of times to page 88 of the transcript of October 25th in the afternoon. He moved a couple of times. Every time he moved, he moved about three times, so he had initiations in each house he's been to in each encampment. So he actually said he did move several times. He did give time frames and whether that was meant in June, too, and the government never tried to narrow it down. With respect to the meetings, Steve did say they met twice a month. What he didn't say was that one of those June, if there were two meetings, first of all, he didn't say there were two meetings in June. It was only referenced to one, and he didn't say, and that was not at the house, he didn't say there was another meeting. Sherry Lou said they met sporadically. So the notion that there was a second meeting, and if there was a second meeting, it was at some house that he resided at, is just essentially speculation, not any evidence at all. They talk about the dependent status in 2005, but there's no indication of what Octavia Williams had to do to obtain that status for Mr. Williams or when she did that. She may have done that in February, knowing he was getting out of, there's no indication of when she obtained that. The state of, how far into the six minutes was that? There is absolutely no evidence of how far into the six minutes Mr. Sergeant Johnson fell down. As a matter of fact, if you take Sim's testimony, Sim's description of it was that there was two or three minutes of punching by the others, and then he and Mr. Williams came in for two or three minutes, and it wasn't until after that. So that would be five to six minutes, according to Mr. Sim. So your brief says by halfway through at least, Johnson no longer was hyper and was responding only yeah versus hell yeah. I'm not sure that's my brief. Oh, I'm sorry, it's the government's brief. Excuse me, I'm sorry. So what do you respond to that? There was testimony that he was not as hyper as it went along. Yeah. There was no testimony about how far into the six minutes that extended. So that's just a misstatement by the government? No, there was testimony right, right, that that was halfway through right. There's no testimony as to the number of minutes of when that occurred. As a matter of fact, the government left out another important point. At the end, when the people didn't hear that the six minutes was up, Sarah group testified that it was Mr. Williams who yelled out, stop, stop, time is up, when the people didn't hear. By the way, there were not eight people participating. Sims and Sarah group said there were nine people total there. One of those was Sergeant Johnson. Two of them didn't participate at all. Sarah group was injured and Ellis did not participate. So that gets you down to six. Sims testified that he and Mr. Williams stood to the side for the first two or three minutes and then they came in alone. So there were six people participating and Sims testified that it was four and two. Not anywhere near eight people punching him at one time was the testimony. And Sarah group confirmed that testimony about that he and Ellis did not participate, that Johnson was one of the nine people there. And then just to make clear, what I argued with respect to the consent was we understand the consent is not a defense, but it has to factor into whether he intended to kill Sergeant Johnson. When Sergeant Johnson, every time he was asked did he want it, was he ready, do you still want it, he said yes. That was the argument. And, Judge Kavanaugh, you're right. It came to be consent is a shorthand term for that. But Judge Friedman clearly knew what we were talking about. The government clearly knew. He twice pulled out exactly the same thing. And the government clearly knew because what they said was, under no circumstances, you can't even consider it in his intent or anything else. And that's what, that was the crux of the defense, essentially, distinguishing between murder and manslaughter. And then Judge Friedman said, refused to give any corrective instruction to that. By the way, both sides didn't want the state-of-mind instruction. Both sides said we don't want the state-of-mind instruction. And the notion that the- Why? It's not in the record. We, so I don't know- Why was it a rational defense counsel? Why? Well, I'm not saying it was a rational defense counsel in this case. But because it was precluded from considering, so we were afraid the jury would say, well, we're precluded from this, so what evidence is there out there that we can determine this from? Because the government had told the jury they couldn't consider this whole thing about him repeatedly saying yes. And we just emphasized that there was no such evidence to determine the state-of-mind because they had been precluded. And we were afraid that it would make it even worse. Now, the government says the jury didn't send out any questions or seem confused. And I would say that's right there the nub of the problem. They were clearly told by the government they couldn't consider it. The district court instructions gave them no basis to consider it. So, no wonder they weren't confused. They were told they couldn't consider Sergeant Johnson's repeated affirmations that he wanted to continue. And even if however many minutes, 30 seconds, and there's no testimony at all in the record of how close to the end he didn't say it anymore or wasn't asked anymore. But however long that is, that's not a reason to preclude the fact from the jury's consideration of his prior saying I'm fine. It would be a piece of evidence that the jury could say, well, he stopped at some point saying. But that wouldn't justify them precluding consideration of the fact he said it before. It might go to the right listeners if it was 30 seconds before or three minutes before. But there's no testimony about that. But in any event, it wouldn't warrant. The difference between the murder and manslaughter obviously has sentencing consequences, right? Significant ones. Well, yeah, the maximum sentence for manslaughter is eight years. And the maximum sentence for murder obviously was life, which was given 22 years, which of course is 14 years above the maximum for manslaughter. So, it had dramatic consequences. And it also affected the offense level for the obstruction charge as well. But our theory in the end is that the immediate convictions should be reversed for insufficiency of the evidence. And that the threat conviction, everything else goes with that. But even if for some reason the court doesn't think the threat conviction goes with it, which I think it does, the threat conviction still has to be reversed on all the prejudicial evidence that came in, the pregnancy, the expert, the consent. Do you want to speak to the expert a little bit? Well, there was, before trial, the government told the district court that this group engaged in drugs and robberies and crimes and that they were all initiated in the United States and they were members before they went overseas. And, of course, none of that turned out to be true. And Judge Friedman even said when they tried to, when he revisited the issue at trial, he said, wait a minute, everything you told me, none of that, none of these people were inducted before they went overseas. There's not even any evidence Mr. Williams was inducted before he was in Germany. Scaragoose said, I can't remember. And he said, this has been presented to me in a different way. So, he cut it back. But for some reason, how it could possibly be relevant that the gangster disciples were founded in Chicago by three men in the 1950s, that they had a prison faction of the black gangster disciples that was bossed and split off in the 1960s, that in the 1970s this umbrella organization of the folk nation took over the gangster disciples. When every witness who testified for the government who was in the group said that our main activity was barbecues, going to amusement parks, and the dues were used for helping people with baby gifts and if they needed to go home for an emergency. How that could, any of that could possibly be relevant that there was a prison faction of the gang. And, of course, the extremely prejudicial evidence. Scaragoose had testified that the group was not allowed to use the word beginning in B that was disrespectful to women. And yet when the expert testified, he twice, he said the meaning of the word mob, of the tattooed mob. And then the government highlighted that in both their closing argument and their rebuttal closing argument, emphasizing to the jury what the word mob meant, even though Sims had testified that the group wasn't even allowed to use that word. So this expert testimony, there was no need for it. It was totally irrelevant in most regards. Almost everything he said was totally irrelevant. And a lot of it has been testified to, some of the parts have been testified to by the people. But the disclaimer of any, they all disclaimed any, as a matter of fact, Sims said he never even heard Mr. Williams say the words gangster disciple. The first time he heard those words was when the Army guys, including Sheriff and Sergeant Johnson, came back from Iraq was the first time he ever heard those words in the spring of 2005. So this testimony was utterly irrelevant and extremely prejudicial, talking about prison games and what the words, what the letters mob stood for, which had nothing to do with Mr. Williams' state of mind. And so we would, again, ask that it be reversed for insufficiency of the evidence, the Meech account and the Tampere account be sent back. We go along with that, or if the court thinks that that doesn't go along with that, which I think it does for the reasons in our brief, that that account be reversed for prejudice, for the prejudice from the improperly admitted evidence. You were giving me a case about post-hospitality. Is it in your brief? It is, and I didn't, could I send the court a letter? I'm sorry, I was looking at other things and I apologize, I forgot that. If it's not in your brief, I'm sorry. If it's in the brief, should I send the court a letter? I think there is discussion in the brief of a case where someone was left by the side of the road after being beaten, but it was contemporaneous with the events. There's also a case about some prison guards who beat somebody and then failed to get the person medical attention, but that went on the basis that these guards had custody of the person, so that part of their activities and their depravity was that they had custody, and so it was distinguishable on that ground. And I apologize for not having it. I think Mr. Williams, didn't he have custody? Didn't he have custody? Well, he told them to bring him back to the room and he told Cheris to stay with him. He didn't tell them anything else. Cheris could have taken him to the hospital. He said, I could have taken him to the hospital. He decided on his own not to because he said he was scared of repercussions, but Mr. Williams said nothing to Cheris about not taking him to the hospital until a guy named Norman called Mr. Williams at Cheris' behest. He said, don't take him. Mr. Williams then said, don't take him. Yes, and that was about, depending on whose view of the testimony, somewhere between three to five hours probably after the events. Thank you very much. Okay. Thank you very much. The case is submitted.
judges: Henderson, Griffith, Kavanaugh